UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:17-24197-Civ-Scola

EMILE HOLLANT,
    **Plaintiff,**

vs.

CITY OF NORTH MIAMI, LARRY SPRING;
LARRY JURIGA; SCOTT GALVIN; and DIANA ROMAN,
    **Defendants.**
_____/

# CORRECTED FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Emile Hollant ("Hollant" or "Plaintiff") brings this Corrected First Amended Complaint against Defendants City of North Miami ("City"/"North Miami"/"Defendant"), Larry Spring, Jr., Larry Juriga, Jr., Scott Galvin, and Diana Roman, and states:

## INTRODUCTION

Emile Hollant ("Hollant") has been denied the protection of his civil rights by the concerted conduct of City of North Miami officials in imposing adverse employment actions against him for fulfilling his solemn oath to serve and protect the citizens of North Miami as a member of the North Miami Police Department. The City, in an effort to falsely create a scapegoat for the outrageously unconstitutional police shooting of unarmed health care worker Charles Kinsey on July 18, 2016, wrongly accused Police Commander Hollant of offering a false

narrative of the unjustified shooting by police officer Jonathan Aledda. Because the actions of the North Miami Police Department were thoroughly and exhaustively investigated by both the Florida Department of Law Enforcement and the Miami-Dade State Attorney's Office, the City was well aware that Commander Hollant was not engaged in any improprieties, authorized no misconduct by other officers, and provided full and accurate descriptions of the events transpiring that day.

Commander Hollant is a Haitian-American citizen who realized his lifelong goal of serving and protecting the public as a sworn police officer in the City of North Miami, Florida ("City"). He was among the first Haitian-American police officers in a City that had long been dominated by white officers with a sad history of discrimination against Haitian-Americans and other ethnic, cultural, and racial minorities. Although the City and its government evolved into the modern era, these embedded stains of racism continued in its Police Department, as more fully described in this Complaint.

Hollant rose in the ranks to become a Police Commander with an outstanding and unblemished record as a law enforcement officer. After a police-caused tragedy occurred on July 18, 2016, wherein an unarmed citizen was shot by a City police officer, the City of North Miami, its senior administrators, and its elected officials engaged in an outrageously unconstitutional pattern of due process violations, humiliation, lies, deceit, racism, and slander, all of which arbitrarily destroyed the

beneficial enjoyment of life, professional career, and reputation of Police Commander Hollant. Despite the City's actions against him, Commander Hollant engaged in no impropriety, told the truth at all times about what he observed during that July 18, 2016 event, and refused to participate in a false narrative of what transpired.

This lawsuit seeks to vindicate his rights as protected by the United States Constitution, the Florida Constitution, and the laws of the United States and the State of Florida.

## NATURE OF ACTION AND JURISDICTION

1.    This is an action for damages pursuant to 42 U.S.C. §§ 1983 and 1988, the United States Constitution, and the Florida Constitution, against Defendants for committing acts, under color of state law, with the intent and for the purpose of depriving Plaintiff of rights secured under the Constitution and laws of the United States.

2.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 in that this is an action to redress violations of Plaintiff's federally protected Constitutional rights.

3.    Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b)1 and 28 U.S.C. § 1391(b)2, as all events giving rise to this cause of action occurred in this judicial district and Defendant City is located in this venue.

4.      Plaintiff has retained the undersigned lawyer to represent his interests in prosecuting this action, and said law firms are entitled to their reasonable attorneys' fees and costs incurred in connection with same.

5.      All conditions precedent to the bringing of this action have been met, waived, or would be futile.

## PARTIES

6.      Plaintiff Emile Hollant ("Hollant" or "Commander Hollant") is *sui juris* and a citizen and resident of Miami-Dade County, Florida, within the jurisdiction of the Southern District of Florida.

7.      Defendant the City of North Miami is a municipal corporation within Miami-Dade County, Florida, and operating a police department, and is a person within the meaning of 42 U.S.C. § 1983. The City assumes the risk incidental to the maintenance of a police force and the employment of law enforcement and police officers. It is a commission-manager system of local government under which the City Manager has final decision and policy making authority.

8.      The City is a public entity pursuant to 42 U.S.C. §§ 12131, and subject to the provisions of Title II of the American with Disabilities Act.

9.      Larry Spring ("Spring") is the City Manager for the City of North Miami, Florida.

10.     Laurence R. Juriga, Jr. ("Juriga") is now the Police Chief for the City of North Miami, Florida. He was Assistant Chief at the time of the shooting.

11.     Scott Galvin ("Galvin") is a Councilman for the City of North Miami, Florida.

12.     Dianna Roman ("Roman") is an Internal Affairs Sergeant with the City of North Miami Police Department, North Miami, Florida.

13.     The City is a recipient of federal financial assistance and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

14.     At all times material to this Complaint, the individuals associated with the City, as described fully herein, were employees and public officials of the City and/or were acting as the City's agent and representatives, acting under color of state law.

15.     As a result of the incidents described herein, Commander Hollant experienced severe pain and suffering, including mental anguish, mental, and emotional suffering, embarrassment, shame, humiliation, damage to his professional standing, damage to his reputation, and other damages including but not limited to damages arising from the violations of his constitutional and property rights.

## FACTS

16.     Hollant, a Haitian national born a United States citizen, arrived in the United States in 1981 from Haiti, knowing that with hard work he could provide a life for his family and earn a positive reputation in the community.

17.     For approximately twenty (20) years, Commander Hollant has served the public as a Police Officer. Commander Hollant invested his entire life, his blood, sweat and tears, to his public service as a law enforcement officer.

18.     Commander Hollant began employment with the City of North Miami Police Department, North Miami, Florida on November 27, 1999.

19.     As a result of his many accomplishments during his well-decorated law enforcement career, he rose up the ranks from an classified position with the police force to Police Commander, North Miami Police Department, an unclassified position.

20.     Hollant has an unblemished record as a Police Officer.

## The Shooting Incident

21.     On July 18, 2016, at approximately 5.00 p.m., the City of North Miami Police Department responded to a Miami-Dade 911 call that a man was in the area of 14th Avenue and N.E. 127th Street with what appeared to be a gun to his head and that another gentleman was trying to talk him out of "it."

22.     Commander Hollant positioned himself approximately 170 feet away from where the two subjects, later identified as Soto and Kinsey were located.

23.     Commander Hollant moved from his cover position approximately 170 feet away, so he could retrieve his binoculars from his police vehicle to identify the object in Soto's hand, announcing his intention.

24.     Before Hollant could return to visualize the object in Soto's hands through his binoculars, North Miami Police Officer Aledda fired three shots.

25.     Commander Holland then radioed "400, shots fired", over the police-issued radio.

26.     Commander Hollant did not shoot, took no action against anyone, cooperated fully, and provided truthful information in all subsequent inquiries and investigations.

27.     Then-Police Chief Gary Eugene arrived and asked Hollant why Officer Aledda fired shots. Commander Hollant replied that he had gone back to his car to get a pair of binoculars from his police vehicle and did not witness the shooting.

28.     Three days later on July 21, 2016, then-Assistant Chief Juriga and Major of Investigations Trevor Shinn claimed Commander Hollant lied to Chief Eugene and that Commander Hollant made a statement that caused Officer Aledda to open fire.

## Police Chief Recommends Suspending Hollant, But Decides Not To After Reviewing Radio Transmissions

29. Based on this information, Chief Eugene initially decided to place Commander Hollant on administrative leave. In a meeting with City Manager Larry Spring, the City Attorney, and PIO Natalie Buissereth, Chief Eugene explained "that guy told me that he didn't witness the shooting, I just found out that not only did he witness the shooting, but he gave the order to shoot." The City Manager said the suspension should be without pay. This decision was made at 5:30 pm.

30. After this meeting, Chief Eugene listened to the radio transmissions, which confirmed that Commander Hollant was not lying. In the radio transmissions, Commander Hollant initially said "he appears to be loading his gun." The communications officer asked "did you advise he's loading his gun?" Commander Hollant replied, "it appears he's loading his weapon." Nowhere on the audio did CG cause shots to be fired. In fact, another Sergeant stated on the radio: "I have a visual, it is a toy. QRX," which was code for standby. Yet, Officer Aledda still opened fire.

31. Based on this police communications recording, Chief Eugene understood that Commander Hollant went to his car to retrieve binoculars in order to verify if the object was a toy or a real gun. Chief Eugene thought it made sense that Commander Hollant would leave the scene to get his binoculars from his car. Chief Eugene believed there was an attempt to mislead him into taking action.

32.     Chief Eugene advised the City Manager and the City Attorney of this new development, and told the City Manager to put a hold on their decision to suspend Commander Hollant. Chief Eugene wanted them to listen to the radio transmissions.

## City Manager Refuses To Hear Audio But Demands Hollant Be Suspended Without Pay

33.     The next morning on July 22, 2016, Chief Eugene met with Spring and the City Attorney around 9:00 am. Spring was furious. A reporter from Channel 10 News had heard of the suspension and cornered Spring about it. Spring asked why Commander Hollant was still on the police force. Chief Eugene explained the new developments and asked Spring to listen to the police radio communications. Spring slapped his hand on the desk and told Chief Eugene: You don't understand what I'm telling you. You need to take control of your people. Chief Eugene had the audio in his hand, and begged Spring to listen to it. Spring then ordered Chief Eugene to relieve Commander Hollant of duty.

34.     City Manager Spring and the City Attorney waited in Chief Eugene's conference room for Chief Eugene to show them the paperwork relieving Commander Hollant of his responsibilities. Chief Eugene explained he did not agree with the suspension. Spring ordered that Commander Hollant be suspended without pay, and Chief Eugene formalized the suspension without pay as directed.

35.    Hollant received neither notice nor an opportunity to be heard before this determination and suspension.

36.    City Manager Spring had a meeting with the staff, during which he told them this was a very sensitive situation with what was going on in the nation and North Miami was in the spotlight. Spring advised that if they did not want to be part of the team, it was time to walk away.

### City Manager and Councilman Galvin Destroy Commander Hollant's Reputation at Nationally-Televised Press Conference

37.    The City Manager persisted in his refusal to consider the evidence showing Commander Hollant had not lied and proceeded with a July 22, 2016, national press conference, during which he accused of Commander Hollant of providing misleading statements to investigators.

38.    Spring falsely accused Commander Hollant, among others, of fabricating information about the shooting, lying about his whereabouts when the shots were fired, and that he was not present at the time of shooting.

39.    In truth, Commander Hollant accurately informed investigators he was present at the immediate scene before the shooting and after, and his involvement is captured to some degree in police radio transmissions.

40.    At that same July 22, 2016 conference, North Miami Councilman Scott Galvin falsely accused Commander Hollant of "betraying the badge" and "jeopardizing the lives" of his fellow officers. The press conference was broadcast

worldwide      and      is      published      on      the      CNN      link:
http://www.cnn.com/videos/us/2016/07/22/charles-kinsey-north-miami-shooting-presser-bts.wplg.

41.     Local media also reported on Commander Hollant's suspension based on this information disseminated by Spring and Galvin. *NBC 6 Miami*, *The Miami Herald*, *Channel 7 Miami*, and *Channel 10 Miami* reported that Hollant was suspended because of allegations of "lying about his whereabouts" when the shot was fired and for "giving conflicting statements" about the circumstances surrounding the shooting.

## State Attorney Investigation

42.     The media reports triggered a Miami-Dade County State Attorney Investigation and a Florida Department of Law Enforcement investigation handled by Special Agent Pete Chong,

43.     Commander Hollant voluntarily gave a sworn statement to the Miami-Dade State Attorney's Office regarding the events of the shooting.

44.     Commander Hollant confirmed he did not witness the shooting because he was retrieving his binoculars from his police vehicle.

45.     On August 2, 2016, the Miami Dade State Attorney's Office released an official Close-Out Memo declining to generate a formal criminal investigation. The State Attorney reasoned that there was insufficient evidence to even generate a

formal criminal investigation. According to the State Attorney, "Commander Hollant did not lie, and that there was no evidence of intent by Commander Hollant to mislead or obstruct investigators or command staff officers regarding his involvement in the police shooting and that any discrepancy was the result of a miscommunication." The Close-Out Memo is an official public record.

46.     Commander Hollant was cleared of all wrongdoing by the State Attorney's Office on August 2, 2016. But the City continued with its deceptive investigation.

47.     On or about August 22, 2016, Commander Hollant received confirmation of his assignment to administrative leave with pay pending the indefinite completion date of a North Miami Police Department investigation.

48.     The City also asked the State Attorney's Office to amend its Close-Out memo. The State Attorney's Office refused to amend or retract the Close-Out Memo two times. First via an email on April 5, 2017, from Chief Assistant State Attorney Jose J. Arrojo, and again via an email on April 14, 2017, from Assistant State Attorney Howard Rosen.

49.     Howard Rosen's email explained how Sgt. Roman tried to get him to change the "verbiage" in the Close-Out Memo so it would not state, "We concluded that Commander Hollant did not lie." Mr. Rosen was adamant in his refusal of her request

## **North Miami Internal Affairs Investigation**

50.     North Miami also initiated an internal affairs investigation on July 22, 2016. Sgt. Diana Roman stated in the memo RE: Request to Initiate Internal Affairs #16-06, "She arrived at the scene at approximately 5:25 p.m. and made contact with Commander Hollant. He advised her that he had been present on the scene before and after the shooting, but did not witness the actual shooting when he went to his car to get his binoculars." Because Sgt. Roman had already "made contact with Commander Hollant" she knew very well that Hollant never claimed he was not a witness at the scene. Commander Hollant did, however, insist he was not an eyewitness to the shooting.

51.     Sgt. Roman continued her investigation as if she had no first-hand knowledge of Hollant's whereabouts. She continued her investigation by asking witnesses if they saw Commander Hollant at the scene or if he announced himself as a witness.

52.     A North Miami Police Department Internal Affairs investigation ordinarily lasts no longer than 180 days according to Florida Statute §112.532(6)(a)(2), which states: "The running of the limitations period is tolled during the time that any criminal investigation or prosecution is pending in connection with the act, omission, or other allegation of misconduct."

53.     Sgt. Roman stated in her Investigative Summary that "the investigation was tolled at the request of FDLE…pending the completion of their investigation of Officer Aledda's police-involved shooting." She also stated that it was "tolled pending review by the State Attorney's Office (SAO)."

54.     Commander Hollant, however was not the subject of the FDLE investigation of the shooting. The FDLE was investigating the shooting of the unarmed black man by North Miami Police Department Officer Aledda. As such, the Internal Affairs investigation of Hollant was completely separate from the FDLE investigation of the shooting, which was completed on December 21, 2016.

55.     As such, Commander Hollant's 180-day period for the processing of the Internal Affairs investigation began no later than August 2, 2016, and ended no later than January 29, 2017.

56.     On or about December 20, 2016, the Florida Department of Law Enforcement (FDLE) issued its report on the shooting to the Miami-Dade State Attorney's Office, reaffirming the initial conclusion in the Close-Out Memo that Commander Hollant did nothing wrong.

57.     Internal Affairs Sgt. Diana Roman interviewed Detective Gaudio who told her when he arrived at the scene of the police shooting, he "made contact" with Commander Hollant, who told him he "just arrived."

58.     Det. Gaudio arrived 15 minutes after Sgt. Roman arrived, and according to her own words, Commander Hollant was already on the scene, and had left to get his binoculars when the shooting took place.

59.     Thus, Sgt. Roman knew Det. Gaudio's testimony was false, yet she prepared her investigative summary on May 4, 2017, swearing under penalty of perjury that her report was true and correct.

60.     The *Biscayne Times* published an article in July 2017 entitled *Were they Railroaded?* The article stated: "Sgt. Diana Roman, who was conducting the Internal Affairs Investigation, and police department consultant Adam Burden, who was steering the IA investigation, visited the SAO on February 27 with additional testimony from Reid and others, seeking to get the office to retract its August 2, 2016, statement that 'Commander Hollant did not lie.'"

61.     Sgt. Roman filed a second IA complaint against Commander Hollant on July 25, 2017, as retaliation for his advising her he was going to give additional testimony to the State Attorney's Office on July 24, 2017, which was subsequently dismissed by Juriga.

62.     The City refused to inform Commander Hollant and his representative of the full scope of the investigation

## Galvin's Additional Statements

63.     Around June 2017, Galvin stated in an email that "**Earlier today, the City of North Miami announced they are terminating the employment of Commander Emile Hollant who was present at last summer's shooting of unarmed caretaker Charles Kinsey.**" The email is not a part of the City's records, nor did the City maintain any record of the statement. It was sent in his personal capacity.

## Major Belcher Recommends A Demotion; Cuevas Believes No Action Should Be Taken

64.     The Disposition Panel issued a report on May 24, 2017, erroneously finding that Commander Hollant obstructed the law enforcement investigation by making false statements.

65.     On June 5, 2017, Major Tim Belcher received a summary of the Disposition Panel for Internal Affairs Investigation's report. Upon his review, he recommended that Commander Hollant be demoted to the rank of Sergeant.

66.     On June 5, 2017, Assistant Chief of Police Neal Cuevas submitted a recommendation to the then Chief of Police Gary Eugene disagreeing. He pointed "to the fact that the State Attorney's Office, on two separate occasions, cleared Commander Hollant of lying in an investigation." He explained that the "IA's Panel's finding was not substantiated by the statements and evidence." She made her

disagreement clear: "I do not agree with Major Belcher's recommendation. His interpretation of the facts in this case is flawed."

67.     Within a year of this recommendation, Neal Cuevas was demoted to Sergeant.

### Then-Acting Chief of Police Juriga Decides to Terminate Hollant Instead

68.     Acting Chief of Police Larry Juriga nonetheless sent Commander Hollant a letter *Re: Notice of Intent to Terminate and Right to Pre-Determination Hearing*, on June 14, 2017.

69.     Despite being cleared by the State Attorney's Office and FDLE, the recommendations of Major Belcher and Assistant Chief Cuevas, Acting Chief Juriga informed Commander Hollant of his intent to terminate Hollant's employment with the City based on the Police Disposition Panel findings.

70.     Commander Hollant was given a deadline of June 16, 2017, at 12:00 noon, to request a Pre-Determination Hearing, where he would have the opportunity to provide the Acting Chief with any information that may mitigate or negate the findings in the report and/or the Chief's intent to terminate him. The Pre-determination hearing was scheduled for July 7, 2017.

71.     At the July 7, 2018, hearing, Commander Hollant was not given the opportunity to cross-examine any witnesses, nor was the meeting recorded and placed in the public record. Commander Hollant was not given an opportunity to

remove the stigma caused by the City's very public suspension and termination, nor was he given an opportunity to clear his name.

72.     The Pre-determination hearing was not before a neutral body. The process was not fair.

73.     On December 8, 2017, City Manager authorized Commander Hollant's termination.

<u>**Hollant's Ability to Appeal His Termination**</u>

74.     Commander Hollant attempted to appeal the executive decision by Spring to the City's Personnel Board, but the Board refused to review his termination decision in a letter issued by the City Manager. In the January 9, 2018 letter, the City Manager claimed the Personnel Board did not have jurisdiction to hear the case because Commander Hollant was an unclassified employee at the time of his termination, despite the City affording the requested review to a different City department head.

75.     However, in his June 21, 2017 letter to the Community Council Members, City Manager Spring stated, "If terminated, he will be entitled to an appeal hearing before the Personnel Board to appeal his employment termination."

76.     Commander Hollant may not appeal his termination in state court. The Florida circuit court, acting in its appellate capacity, is only empowered to review

quasi-judicial administrative actions. The termination did not follow from a quasi-judicial administrative procedure.

## Other Allegations

77.     Despite being cleared of wrongdoing on multiple occasions, Commander Hollant was placed on a virtual house arrest for over 16 months.

78.     On January 14, 2017, Commander Hollant requested a modification to his at-home administrative leave restrictions due to his doctor's recommendation. The City and Spring never sent a response to him.

79.     Commander Hollant's placement on "house arrest" constitutes an adverse action as that term is defined by the United States Supreme Court in that it has the practical effect of ending his law enforcement career and subjects him to humiliation.

80.     The procedures used to recommend Commander Hollant's termination, which recommendation was under consideration by City Manager Spring for six (6) months, were unjustified, unconstitutional, and a deprivation of due process to Commander Hollant.

81.     The "procedures" employed by the City and Spring were part of a policy, practice, and custom of the City of denying procedural due process to police officers. Spring also has final policymaking authority and is a final decision maker.

82.     Commander Hollant's placement on house arrest constituted a violation of substantive due process by taking away Commander Hollant's property and liberty interests in his job.

83.     Commander Hollant's treatment by the City was motivated by invidious racism practiced by an old guard in the Police Department, led by Larry Jurigia, Jr., who have not accepted the Haitian-American presence in the City.

84.     Commander Hollant was retaliated against and specifically targeted by Spring, Galvin, and Juriga for exercising his First Amendment Rights.

85.     Specifically, on July 25, 2017, the City targeted Commander Hollant for investigation because he exercised his First Amendment Right to make comments to the media and others concerning his views of the City's false accusations and improper investigation.

86.     Hollant had a clear legal right under the First Amendment to the United States Constitution to express his opinion.

87.     At all times, the City, Spring, Juriga, and Galvin were aware of Commander Hollant's clear legal and federal constitutional rights.

88.     Defendants intentionally violated Commander Hollant's clear legal rights under the First Amendment to the United States Constitution by investigating, harassing, and punishing him for exercising these rights.

89.     Commander Hollant participated in multiple investigations of the City of North Miami's handling of the shooting incident and subsequent events.

90.     This included the investigations by the City of North Miami Police, the Florida Department of Law Enforcement, and the Miami-Dade State Attorney's Office.

91.     During these investigations, Commander Hollant provided truthful information concerning his belief that the City committed malfeasance by making false statements about the investigations, mishandling the investigation, and not being objective in the manner in which it handled the investigation.

92.     Commander Hollant provided complaints in writing to the Miami-Dade Commission on Ethics & Public Trust, the Florida Commission on Human Relations, and other agencies regarding his concerns about misfeasance and malfeasance in the City and Spring's mishandling of the investigation.

93.     Commander Hollant provided a written complaint to the Miami-Dade Commission on Human Relations and the Equal Employment Opportunity Commission ("EEOC") based on his being discriminated against because he is a Haitian-American who complained about white and Hispanic police officers not being objective in their investigation of an incident involving a black citizen.

94.     Commander Hollant received a Right to Sue letter from the EEOC.

95.     Commander Hollant satisfied all conditions precedent to bringing this Complaint.

96.     At all times material, Defendants Larry Spring, Jr., Larry Juriga, Jr., Scott Galvin, and Dianna Roman acted in bad faith, with a malicious purpose, and in a manner exhibiting wanton and reckless disregard of Plaintiff's human rights, safety, and property.

97.     At all times, the placement of Commander Hollant on administrative leave prevented him from leaving his home, carrying a badge, or representing himself as police officer.

98.     At all times, the continuation of Commander Hollant on administrative leave was adverse action that has impeded and harmed his career.

99.     At all times, Defendants Larry Spring, Jr., Larry Juriga, Jr., Scott Galvin, and Dianna Roman acted to retaliate against Commander Hollant in violation of his civil rights, to humiliate him, and to cause him severe emotional duress.

## COUNT I – 42 U.S.C. §1983 DUE PROCESS PROPERTY VIOLATION
## (against City Manager Larry Spring, City Of North Miami, Larry Juriga)

Plaintiff Commander Hollant reincorporates and re-alleges paragraphs 1-99 as though set forth full herein and further alleges as follows:

100.   Commander Hollant had a property right in his continued employment with the Defendant City as guaranteed by the United States Constitution, which included but is not limited to:

a.   Under the Collective Bargaining Agreement, he could only be terminated for cause. Article 7, *Agreement Between City Of North Miami, Florida And Dade County Police Benevolent Association*.

b.   Under the Collective Bargaining Agreement, an employee relieved of duty pending an investigation or other administrative action, must remain on with-pay status with emoluments of office during the investigation period. Article 17(K)(1), *Agreement Between City Of North Miami, Florida And Dade County Police Benevolent Association*.

c.   Under the City's Civil Service Rules, if an employee is separate from his or her unclassified position, the employee shall be returned to the position and classification held in the classified

service immediately prior to becoming an unclassified employee.

Rule IX(F), *North Miami Civil Service Rules*

101.   The Fourteenth Amendment to the United States Constitution prohibits the City from depriving a person like Commander Hollant of property without due process of law.

102.   The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires, *inter alia*, that City Manager Spring provide Commander Hollant with a pre-deprivation hearing or "some opportunity for the employee to present his side of the case … before the termination takes effect." *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985).

103.   The Due Process Clause requires that City Manager Spring provide Commander Hollant notice of the charges against him, an explanation of the Defendant City's evidence, and provide an opportunity for Commander Hollant to present his side of the story.

104.   City Manager Spring and Juriga violated Commander Hollant's due process rights by taking adverse actions, including but not limited to:

> a.   Placing Commander Hollant on administrative leave without pay on July 22, 2016,
>
> b.   Placing Commander Hollant on administrative leave with pay on August 22, 2016,

c. Terminating Commander Hollant on December 8, 2017.

105. In connection with the adverse actions taken against Commander Hollant's employment, the Defendants made and disseminated several false statements of fact, including but not limited to:

a) That Commander Hollant obstructed the law enforcement investigation by way of false statements.

b) That Plaintiff violated the following Standard Operating Procedures and General Rules and Regulations:

1. General Rules and Regulations, Section 7, Members withholding information or furnishing unauthorized and/or confidential information with a view to personal gain or for any other reason shall be subject to disciplinary action.

2. General Rules and Regulations, Section 22, Members are required to speak the truth at all times and under all circumstances, whether under oath or otherwise, except in cases where they are not allowed by the rules of the service to divulge facts within their knowledge, in which case they remain silent.

3. Standard Operating Procedure, 300.19 V.E., Identify and locate all witnesses and police officers at the scene. Keep all

witnesses, including involved officer(s) and witness officer(s) separated. Prevent any officers or others from interviewing the involved officer(s) prior to the arrival of the Shooting Team.

4. General Rules and Regulations, Section 44, Members of the Police Department shall not make false official reports, or knowingly enter or cause to be entered in any Police Department books or records any inaccurate, or false information.

c)     That Plaintiff made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator.

d)     That Commander Hollant was derelict in performing his duties and tasks at the scene of the shooting.

e)     That when Commander Hollant left to get his binoculars, he failed to monitor the radio and provide any direction to his subordinate officers.

f)     That Commander Hollant may have colluded with a police officer to circumvent the internal affairs investigation.

g)     That Commander Hollant did not write a supplementary report.

     h)     That Commander Hollant betrayed the badge and jeopardized the lives of his fellow officers.

106.   These false and irresponsible statements to the national and local media by City Manager Spring, Commissioner Galvin, and other employees, and the false and irresponsible statements placed in his personnel file (a public record) have stigmatized Commander Hollant, rendering him unable to obtain other appropriate employment in the field of law enforcement.

107.  City Manager Spring and Juriga failed in their obligation to give Commander Hollant notice of the reason for his taking adverse action(s) against him at or before placing him on administrative leave without pay.

108.   There was no significant hazard to keeping Commander Hollant on his post. Chief Eugene, who originally recommended Commander Hollant be placed on administrative leave, retracted his 5:30 pm recommendation by 9:00 am the next day after reviewing the audio recordings of the radio transmissions. The City Manager was fully aware that Commander Hollant had withdrawn his recommendation and claims of false statement and provided physical proof. Yet, he ordered Commander Hollant's suspension without pay and permanently damaged his reputation in a nationally-televised press conference.

109. The Defendants employed no rule or ordinance that entitled Commander Hollant to receive notice of any adverse action(s) against him and the

reason(s) for such action at or before being subjected to any adverse employment action(s).

110.  City Manager Spring and Chief Juriga further failed to give Commander Hollant a fair, impartial, and timely opportunity to be heard prior to taking adverse action(s) against him.

111.  Florida provides no post-termination remedies for any procedural deprivation occasioned by the unfair, partial, and biased procedure leading to Commander Hollant's termination. Nor does the City.

112.  The Defendants enacted/employed no rule or ordinance that entitled Commander Hollant to have a hearing prior to being subjected to any adverse action(s).

113.  The Defendants thus deprived Commander Hollant of his property interest – his continued employment – without a constitutionally adequate process.

114.  City Manager Spring has final policymaking authority in the City of North Miami.

115.  The defendants knew or reasonably should have known their conduct would lead to the deprivation of Commander Hollant's constitutional rights by the City of North Miami.

116.  As a direct and proximate result of the Defendants actions as aforesaid, Commander Hollant suffered damages in the form of the no loss of his job but was

placed under house confinement, wages, benefits, reputation, identity, and other damages.

For these reasons, Plaintiff Commander Emile Hollant demands the entry of a judgment in his favor and against Defendant Larry Spring after trial by jury, by determining and declaring that the Defendants City of North Miami, City Manager Spring, and Larry Juriga violated Commander Hollant's due process rights, reinstating him, awarding him damages, including for damages to his reputation, lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorney's fees, costs, and all interest allowed by law.

## COUNT II – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION AGAINST THE CITY OF NORTH MIAMI

Plaintiff reincorporates and re-alleges paragraphs 1-99 as though set forth fully herein and further alleges as follows:

117.   The Fourteenth Amendment prohibits the Defendant City from depriving a person like Commander Hollant of liberty or property without due process of law.

118.   The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

119.   In connection with the adverse actions taken against Commander Hollant's employment, the Defendant City made and disseminated several false statements of fact, including but not limited to:

a)   That Commander Hollant obstructed the law enforcement investigation by way of false statements.

b)   That Plaintiff violated the following Standard Operating Procedures and General Rules and Regulations:

1.   General Rules and Regulations, Section 7, Members withholding information or furnishing unauthorized and/or confidential information with a view to personal gain or for any other reason shall be subject to disciplinary action.

2.   General Rules and Regulations, Section 22, Members are required to speak the truth at all times and under all circumstances, whether under oath or otherwise, except in cases where they are not allowed by the rules of the service to divulge facts within their knowledge, in which case they remain silent.

3.   Standard Operating Procedure, 300.19 V.E., Identify and locate all witnesses and police officers at the scene. Keep all witnesses, including involved officer(s) and witness officer(s)

separated. Prevent any officers or others from interviewing the involved officer(s) prior to the arrival of the Shooting Team.

4. General Rules and Regulations, Section 44, Members of the Police Department shall not make false official reports, or knowingly enter or cause to be entered in any Police Department books or records any inaccurate, or false information.

c)  That Plaintiff made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator.

d)  That Commander Hollant was derelict in performing his duties and tasks at the scene of the shooting.

e)  That when Commander Hollant left to get his binoculars, he failed to monitor the radio and provide any direction to his subordinate officers.

f)  That Commander Hollant may have colluded with a police officer to circumvent the internal affairs investigation.

g)  That Commander Hollant did not write a supplementary report.

h)      That by giving misinformation to the police department, he not only jeopardized Mr. Kinsey's life and the life of his client, but he jeopardized the life of every police officer that serves this city.

120.   The aforementioned statements are materially false.

121.   The statements were made in connection with Commander Hollant's administrative suspension without pay, suspension with pay, and ultimate termination.

122.   The Defendant City provided Commander Hollant no meaningful opportunity for a name clearing hearing. He was given a Pre-Determination Hearing, but he was not given the opportunity to cross-examine any witnesses.

123.   Moreover, he was not given notice and an opportunity to address the claim that he betrayed the badge and jeopardized Mr. Kinsey's life, the life of Kinsey's client, and the life of every police officer serving in the City of North Miami, cited in connection with his suspension.

124.   The false statements of fact identified above have cast a disparaging cloud over Commander Hollant's reputation for honesty and competency.

125.   As a direct and proximate result of the Defendant City's actions as aforesaid, Commander Hollant suffered damages, including, but not limited to, loss of employment, confinement to his home five (5) days a week from 8 am to 5 pm,

benefits, his law enforcement identity, his reputation, emotional distress, a blow to his reputation, his job, and other damages.

For these reasons, Plaintiff Emile Hollant demands the entry of a judgment in his favor and against Defendant City of North Miami after trial by jury, by determining and declaring that the Defendant City violated Commander Hollant's due process rights, awarding damages, including to his reputation, lost past and future wages and employment-related benefits, emotional distress damages, to have all offending information removed from his personnel and internal affairs files, a hearing to have his file cleared, attorneys' fees, costs, and all interest allowed by law.

## COUNT III – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION AGAINST CITY MANAGER LARRY SPRING

Plaintiff reincorporates and re-alleges paragraphs 1-99 as though set forth fully herein and further alleges as follows:

126.   The Fourteenth Amendment prohibits the Defendant City and Defendant Spring from depriving a person like Commander Hollant of liberty or property without due process of law.

127.   The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

128.   Commander Hollant worked hard personally and professionally to earn a stellar reputation during his career in law enforcement public service, which began in 1989.

129.   In connection with Commander Hollant's employment, the Defendant City and Defendant Spring made and disseminated several false statements of fact, including but not limited to:

a)   That Commander Hollant made inconsistent statements under oath to the Florida Department of Enforcement investigator and to the Internal Affairs Investigator;

b)   That Commander Hollant lost control over the subordinate officers;

c)   That Commander Hollant may have colluded with a police officer to  circumvent the internal affairs investigation.

130.   The aforementioned statements are materially false.

131.   The statements were made in connection with Commander Hollant's administrative suspension without pay, suspension with pay, and ultimate termination.

132.   The Defendants City and Spring provided Commander Hollant no meaningful opportunity for a name clearing hearing.

133.   As a direct and proximate result of the Defendant City Manager's action as aforesaid, Commander Hollant suffered damages in the form of loss of suspension

without pay, home confinement, his job, benefits, identity, reputation, and other damages.

For these reasons, Plaintiff Commander Emile Hollant demands the entry of a judgment in his favor and against Defendant Larry Spring, trial by jury, by determining and declaring that the Defendant City Manager Spring violated Commander Hollant's due process rights, awarding damages, including to his reputation, lost past and future wages and employment-related benefits attorneys' fees, costs, and all interest allowed by law.

## COUNT IV – 42 U.S.C. §1983 LIBERTY INTEREST VIOLATION AGAINST SCOTT W. GALVIN

Plaintiff reincorporates and re-alleges paragraphs 1-99 as though set forth fully herein and further alleges as follows:

134.   The Fourteenth Amendment prohibits Defendant Galvin from depriving a person like Commander Hollant of liberty or property without due process of law.

135.   The concept of liberty recognizes two particular interests of a public employee: (a) the protection of his good name, reputation, honor and integrity, and (b) his freedom to take advantage of other employment opportunities.

136.   Commander Hollant worked hard personally and professionally to earn a stellar reputation during his career in law enforcement public service, which began in 1989.

137.   Defendant Councilman Galvin made and disseminated false statements of fact, including but not limited to: that Commander Hollant made inconsistent statements under oath to the Florida Department of Law Enforcement investigator and to the Internal Affairs Investigator – *i.e.*, that he "lied", and that Commander Hollant was "betraying the badge" and "jeopardizing the lives" of his fellow officers.

138.   The aforementioned statements are materially false.

139.   Defendant Galvin made the statements to CBS 4, in his official capacity as well as in his individual capacity, knowing and intending that such statement would cause harm to Commander Hollant's personal and professional reputation with the intent of harming Commander Hollant's reputation and his ability to obtain future employment.

140.   Defendant Galvin's statement to the public about Commander Hollant was knowingly and materially false and/or made with reckless disregard for its truth or falsity, made with the intent to harm Commander Hollant's reputation and his ability to obtain future employment.

141.   Defendant Galvin's statement was made with the malicious intent to injure Commander Hollant and it did, in fact, injure Commander Hollant's reputation and has and will injure his ability to obtain future employment.

142.   The false statements impacted Commander Hollant's administrative suspension without pay, suspension with pay, and ultimate termination.

143.   Commander Hollant was not given notice and an opportunity to address the claims, including the claim that he betrayed the badge and jeopardized Mr. Kinsey's life, the life of Kinsey's client, and the life of every police officer serving in the City of North Miami, cited in connection with his suspension.

144.   As a direct and proximate result of the Defendant Councilman Galvin's actions as aforesaid, Commander Hollant suffered damages to his reputation for integrity, honesty, professionalism, and competency.

For these reasons, Plaintiff Emile Hollant demands the entry of a judgment in his favor and against Defendant Scott Galvin, after trial by jury, by determining and declaring that Defendant Galvin violated Commander Hollant's liberty interest rights, and awarding damages, including for damages to his reputation, attorneys' fees, costs, and all interest allowed by law.

## COUNT V - VIOLATION OF FLORIDA WHISTEBLOWER STATUTE
## VIOLATION OF § 112.3187, F.S. AGAINST CITY

Plaintiff incorporates paragraphs 1 through 99 as if fully set forth herein.

145.   The City of North Miami is an agency, a term defined by Section 112.3187 (3)(a), Florida Statutes.

146.   Plaintiff was, at all times material, an employee as that term is defined by Section 112.3187(3)(b), Florida Statutes.

147.   The City of North Miami took adverse personnel action against the Plaintiff, as that term is defined by Section 112.3187(3)(c), Florida Statutes.

148.   The action taken against Plaintiff included suspension, loss of titles, positions, compensation, and benefits within the City, as well as termination.

149.   The actions taken by the City were prohibitive under Section 112.3187(4), Florida Statutes.

150.   The prohibitive actions were taken because the Plaintiff disclosed information, as defined by Section 112.3187(5)(a) and (b), Florida Statutes.

151.   Plaintiff disclosed suspected violations of federal, state, and local law and regulations committed by employees and agents of the City of North Miami.

152.   Plaintiff disclosed acts and suspected acts of gross management, malfeasance, misfeasance, and gross waste of public funds committed by employees and agents of the City of North Miami.

153.   Plaintiff participated in investigations and other inquiries conducted by agencies of the Local, State, and Federal government as defined in § 112.3187 (7).

154.   Plaintiff disclosed information to the Miami Dade State Attorney's Office, the Florida Department of Law Enforcement, the Miami-Dade Commission on Ethics & Public Trust, and the appropriate local officials as those terms are defined in Section 112.3187(6).

155.   In his FDLE investigative interview on August 11, 2016, Commander Hollant disclosed that Milton Reed drove Officer Aledda, the shooting officer and the subject of the investigation, to his house; that individuals within the police department were trying to shift the blame from Aledda to him by making false statements; and that the local investigation into the police shooting was led by a person with a conflict of interest.

156.   In his January 2017, MDCOE complaints, Commander Hollant disclosed that the investigation into the shooting may not be objective, as demonstrated by their failure to observe standard operating procedures in pursuing the shooting investigation.

157.   Plaintiff filed written and signed complaints disclosing information enumerated in Section 112.3187 (5) and to parties and entities enumerated in Section 112.3187(6).

158.   Plaintiff refused to participate in adverse actions prohibited by §
112.3187.

159.   Plaintiff refused to participate in unethical, illegal, and inappropriate
violations of Federal, State, and local laws, rules, regulations, and policies, and
disclosed to City officials and officers such violations and misrepresentations to City
and State officials.

For these reasons, Plaintiff requests immediate reinstatement to his position
as Commander, along with reinstatement to his former position, with full pay
including back pay and front pay, benefits, compensation, seniority rights, and any
lost income and compensatory damages. Plaintiff additionally seeks immediate
payment of all attorneys' fees and costs.

## COUNT VI - VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964—EMPLOYMENT DISCRIMINATION IN VIOLATION OF TITLE VII

Plaintiff re-alleges paragraphs 1 through 99 as if fully set forth herein.

160.   Commander Hollant is a Haitian male.

161.   Commander Hollant has been discriminated against by the City of
North Miami by being denied an appropriate salary level, fringe benefits, and by
being ridiculed, suspended without due process and subjected to a hostile work
environment in comparison to non-Haitian officers and employees.

162.   The City intentionally discriminated against Commander Hollant in his compensation and the terms and conditions of his employment because of his National Origin.

163.   Officer Aledda, a non-Haitian American, received different treatment and was more than similarly situated.

164.   Although Officer Aledda was the shooter and radio communications demonstrated he should have known the alleged victim of the shooting was merely holding a toy gun, he was placed only on administrative leave.

165.   Officer Aledda remained on administrative leave with pay even after being arrested and charged with attempted manslaughter and culpable negligence for his role in the shooting on April 12, 2017. Under the Collective Bargaining Agreement, the City was authorized to suspend him without pay because of the filing of an information or indictment charging him with a felony. Article 17(M), *Agreement Between City Of North Miami, Florida And Dade County Police Benevolent Association*.

166.   The difference in treatment, which included Commander Hollant's unlawful suspension without pay and his ultimate termination, were because of Commander Hollant's national origin.

167.   As result of this discrimination, Commander Hollant suffered damages. For these reasons, Plaintiff Emile Hollant demands judgment for damages

against the City of North Miami, Florida, including five million dollars ($5,000,000.00) in compensatory damages, along with punitive damages, attorneys' fees and costs, and other available relief as the Court deems just and proper.

**COUNT VII - INTENTIONAL INFLICTION OF EMOTIONAL DURESS**
**(Against Defendants SPRING, JURIGA, GALVIN and ROMAN)**

Plaintiff incorporates paragraphs 1 through 99 as if fully set forth herein.

168.   Defendants Spring, Juriga, Galvin, and Roman engaged in outrageous conduct.

169.   Their conduct was intended to inflict harm on the Plaintiff.

170.   As a result of the Defendants' outrageous conduct, Plaintiff suffered severe emotional and physical duress.

171.   At all times material, the Defendants acted in bad faith, with malicious purpose, and in a manner exhibiting wanton and reckless disregard of Plaintiff's civil rights, safety, and property.

172.   Such conduct by the Defendants were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

173.   As a direct and proximate result of the negligence acts, as alleged herein, the Plaintiff suffered injury, which resulted in pain and suffering, mental anguish, loss of capacity for the enjoyment of life, inconvenience, care, and treatment, loss of earnings, and loss of the ability to earn money in the future. The

losses are either permanent or continuing in nature and Plaintiff will suffer said losses in the future.

For these reasons, Plaintiff demands judgment for compensatory damages against Defendants Spring, Juriga, Galvin, and Roman, together with attorneys' fees and costs incurred herein and all other relief the Court deems just and proper.

### COUNT VIII - SLANDER
### (against GALVIN)

Plaintiff incorporates paragraphs 1through 99 as if fully set forth herein.

174.   Galvin disseminated comments about Commander Hollant that were materially false.

175.   On July 22, 2016, North Miami Councilman Scott Galvin, at a national press conference, falsely accused Commander Hollant of "betraying the badge" and "jeopardizing the lives" of his fellow officers. The press conference was broadcast worldwide and is published on the CNN link: http://www.cnn.com/videos/us/2016/07/22/charles-kinsey-north-miami-shooting-presser-bts.wplg.

176.   Galvin's CNN statement was delivered in his individual capacity. As the City Commissioner of a commission-manager system, the City Manager has final policymaking authority and is the voice of the City on matters of public policy.

177.   Around June 2017, Galvin sent an email that "**Earlier today, the City of North Miami announced they are terminating the employment of**

**Commander Emile Hollant who was present at last summer's shooting of unarmed caretaker Charles Kinsey."**

178. The email is not an official city record and is not a part of the public record. It was sent in his individual capacity.

179. Galvin intentionally disseminated these false statements about Commander Hollant knowing that they were completely false.

180. Galvin did this with malice intent and with the intent to harm Commander Hollant.

181. Galvin made these comments outside the scope of his duties as a City Councilman and with no privilege.

For these reasons, Plaintiff Emile Hollant demands damages, compensatory damages, attorneys' fees and costs, and all other relief deemed appropriate by the Court.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands a trial by jury of all issues triable.

Respectfully submitted,

*S/ Michael A. Pizzi, Jr.*
**MICHAEL A. PIZZI, JR.**
Florida Bar No. 079545
**MICHAEL A. PIZZI, JR. P.A.**
6625 Miami Lakes Dr. East, Suite 313
Miami Lakes, FL 33014
Tel: 305.777.3800
Fax: 305.777.3802
mpizzi@pizzilaw.com

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**MICHAEL T. DAVIS**
Florida Bar No. 63374
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
efiling@kuehnelaw.com

## CERTIFICATE OF SERVICE

I CERTIFY that on March 12, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in another authorized manner for those counsel or parties not authorized to receive electronically Notices of Electronic Filing.

By:  *S/ Benedict P. Kuehne*
     **BENEDICT P. KUEHNE**

## SERVICE LIST

## EMILE HOLLANT v. CITY OF NORTH MIAMI, LARRY M. SPRING, JR., LARRY JURIGA,  SCOTT W. GALVIN, and DIANA ROMAN CASE NO. 1:17-cv-24197-SCOLA

Michael A. Pizzi, Jr.
MICHAEL A. PIZZI, JR. P.A.
6625 Miami Lakes Dr East Ste 313
Miami Lakes, Florida 33014
Tel: (305) 777-3800
Fax: (305) 777-3802
mpizzi@pizzilaw.com

Benedict P. Kuehne
Michael T. Davis
KUEHNE DAVIS LAW, P.A.
100 S.E. 2nd St.
Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
Email: ben.kuehne@kuehnelaw.com
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
*Counsel for Plaintiff*

Eric P. Hockman
Brett J. Schneider
Michael S. Kantor
WEISS SEROTA HELFMAN COLE
& BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
Tel: 305-854-0800
Fax: 305-854-2323
ehockman@wsh-law.com,
szavala@wsh-law.com
mkantor@wsh-law.com,
bschneider@wsh-law.com,
falonso@wsh-law.com

Jennifer L. Warren
CITY OF NORTH MIAMI
Office of the City Attorney
776 NE 125th St
North Miami, FL 33161-5654
Tel: (305) 895-9810
Fax: (305) 895-7029
jwarren@northmiamifl.gov
*Counsel for Defendants*